1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
  ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

*Attorneys for Plaintiff Juan Perez
and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| JUAN PEREZ, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC., MARK ZUCKERBERG, and DAVID M. WEHNER,<br><br>            Defendants. | CASE NO.:<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Juan Perez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Facebook, Inc. ("Facebook" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities who purchased the publicly traded securities of Meta Platforms, Inc. (formerly known as Facebook, and sometimes referred to as such herein) between April 29, 2021 and October 21, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder

by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## DIVISIONAL ASSIGNMENT

6.     In compliance with Local Rule 3-5(b), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Mateo.

## PARTIES

7.     Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Facebook's securities during the Class Period and was damaged thereby.

8.     Defendant Meta Platforms, Inc. is the world's largest online social network, with 3.3 billion monthly active users. The Company is incorporated in Delaware and its principal executive offices are located at 1601 Willow Road, Menlo Park, CA 94025.

Facebook securities are traded on NASDAQ under the ticker symbol "FB."

9.      Defendant Mark Zuckerberg ("Zuckerberg") has been the Chief Executive Officer ("CEO") of Meta Platforms throughout the Class Period.

10.     Defendant David M. Wehner ("Wehner") has been the Chief Financial Officer ("CFO") of Meta Platforms throughout the Class Period.

11.     Defendants Zuckerberg and Wehner are sometimes referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

   a)     directly participated in the management of the Company;

   b)     was directly involved in the day-to-day operations of the Company at the highest levels;

   c)     was privy to confidential proprietary information concerning the Company and its business and operations;

   d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   g)     approved or ratified these statements in violation of the federal securities laws.

13.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## FACTUAL ALLEGATIONS

16.     Meta Platforms, then known as Facebook, was founded as a Delaware corporation in 2004 by Defendant Zuckerberg while he was a student at Harvard University.  Today, Facebook operates a social-networking service through its website, www.facebook.com, and its mobile applications.  Facebook's family of products encompasses the platforms and applications called Facebook, Instagram, Messenger, WhatsApp, and Facebook Reality Labs.

17.     Facebook receives virtually all of its revenue from advertisements sold to marketers across its various platforms and applications.  Fundamentally, the larger Facebook's user database grows, and the more detailed information that Facebook can extract from those users, the more money Facebook makes.  The more money Facebook makes, the more valuable it is as a company to investors. As a result, any information collected by Facebook that demonstrates harms to users is material to Facebook's bottom

line and to its desirability to investors.

18.    In an early 2003 foreshadowing of the current endemic ills plaguing Facebook, Defendant Zuckerberg, a student at the time, launched FaceMash.  FaceMash was a sophomorically conceived site displaying pairs of female classmates and inviting other students to comment on who was more attractive.  In response to questioning at a 2018 U.S. Congressional hearing, Defendant Zuckerberg smirkingly described FaceMash as ". . . a prank website that I launched in college, in my dorm room, before I started Facebook[.]"[1]

19.    Thus, even prior to the founding of Facebook, Zuckerberg was reveling in the objectification of women through the unauthorized public dissemination of superficial physical characteristics presented in two-dimensional photographs.

20.    The danger and lesson of Zuckerberg's "prank" seems to have eluded Facebook. At least as early as 2019, Facebook conducted detailed in-house research that indicated a startling fact: that the Company exacerbated negative body image issues for one in three teenage girl users on Instagram's platform.[2] In addition, and without prompting, teens in Facebook's research blamed Instagram for increased rates of anxiety

_____

[1] *Channeling 'The Social Network,' lawmaker grills Zuckerberg on his notorious beginnings,* THE WASHINGTON POST (April 11, 2018), 'What was FaceMash?' Facebook CEO Mark Zuckerberg faces questions about his notorious website at Harvard - The Washington Post.

[2] Wells, Horowitz and Seetharaman*, The Facebook Files*, THE WALL STREET JOURNAL, www.wsj.com, Sept. 14, 2021.

and depression.[3]

21.     Rather than making meaningful changes to safeguard the health and safety of those vulnerable teenage girl users, and without any public disclosure in its annual reports for 2019 and 2020, Facebook continued the implementation of techniques that "increase the frequency and duration of engagement by young users and the resulting harms caused by such extended engagement."[4]

22.     The failure of Facebook to include any information regarding its internal studies indicating Instagram's harm to teenage girls in its annual reports for 2019 and 2020 is a material omission of information significant to investors' decisions to buy or sell the Company's stock.

23.     "Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show; Its own in-depth research shows a significant teen mental-health issue that Facebook plays down in public."[5]   The Company's failure to act on this disturbing information, as well as its downplay of the information after it was publicly disclosed by former employee and whistleblower Frances Haugen, has prompted numerous state attorneys general to launch investigations into possible violations by Facebook of

---

[3] *Id.*

[4] Horowitz and Wells, *Instagram's Effects on Children are Being Investigated by Coalition of States,* THE WALL STREET JOURNAL, www.wsj.com, Nov. 18, 2021.

[5] Wells, Horowitz and Seetharaman*, The Facebook Files*, THE WALL STREET JOURNAL, www.wsj.com, Sept. 14, 2021.

consumer protection laws.[6]

24.    Regarding Building and Maintaining User Trust, particularly with regard to Safety Tools, Facebook's annual reports for 2013 and earlier state that "These tools are coupled with educational resources and partnerships with online safety experts to offer protections for all users, **particularly teenagers. We take into account the unique needs of teenagers who use our service and employ age-appropriate settings that restrict their visibility, limit the audience with whom they can share, and help prevent unwanted contact from strangers**." (emphasis added).

25.    These early statements regarding user trust and safety demonstrate that Facebook recognized, yet subsequently ignored, the "unique needs of teenagers" and Facebook's efforts and responsibility to maintain "age-appropriate settings."

26.    Dangerous practices targeting female teen's safety and security is only one parallel to be found between Facebook and FaceMash. To launch FaceMash, Zuckerberg reportedly discussed hacking into the school's computer servers to surreptitiously download photos of students without their permission. *Id*. The student newspaper at the time reported that Zuckerberg was accused by the school of "'breaching security, violating copyrights and violating individual privacy[.]'" *Id*.

27.    Eighteen years later, Zuckerberg's Facebook is accused of strikingly similar conduct: an article entitled "Facebook Rife With Stolen Content," indicates that Facebook

---

[6] Horowitz and Wells, *Instagram's Effects on Children are Being Investigated by Coalition of States,* THE WALL STREET JOURNAL, www.wsj.com, Nov. 18, 2021.

channels approximately 40% of its traffic to sites with plagiarized and/or recycled content and fails to effectively police copyright infringement.[7]  As noted below, these issues affect the quantity and quality of distinct users and the desirability of those uses to marketers.

28.     Regarding marketing, Facebook's annual reports for years 2016 through 2018 state: "To date, **our communities have grown organically with people inviting their friends to connect with them, supported by internal efforts** to stimulate awareness and interest."  Facebook's annual reports for years 2019 and 2020 were tweaked slightly to state: "**Historically**, **our communities have generally grown organically with people inviting their friends to connect with them, supported by internal efforts** to stimulate awareness and interest." (emphasis supplied).

29.     These statements were misleading in that during those times, Facebook, including on its platform Instagram, employed techniques that drove, rather than supported, the frequency and duration of teenage girl engagement.  This is the antithesis of "organic" growth.

30.     Relatedly, in a November 2, 2021 statement by Facebook's VP of Artificial Intelligence, Jerome Pesenti, Facebook indicated that it was shutting down the Face Recognition System ("FRS") that had collected up to that point more than a billion individual facial recognition templates.  The implementation of the FRS has been described as a "growth hack," used by Facebook to encourage facially identified users to

---

[7] Hagey and Horowitz, *The Facebook Files*, THE WALL STREET JOURNAL, www.wsj.com, Nov. 9, 2021.

CLASS ACTION COMPLAINT - 9

intensify their use of Facebook.  Since its implementation, FRS has been used in negative ways, such as by Clearview AI to scrape user faces and sell the information to repressive regimes to identify dissenters.  New York Times tech reporter Casey Newton indicated that FRS's value as a growth hack to Facebook most likely had been exhausted by the time of Pesenti's statement.[8]  Once again, using FRS to encourage those identified to expand their engagement with Facebook platforms is the antithesis of "organic."

31.    Beginning in September 2021, the Wall Street Journal's Facebook Files, gleaned from the treasure trove of internal Facebook documents supplied by whistleblower Haugen, have chronicled a years-long series of internal concealed failures to control Facebook's platforms, contrary to Facebook's statements of the effectiveness of its internal procedures.

32.    These include, in addition to the above-mentioned failures: exempting elite "whitelisted" users from enforcement actions for their rule-violating material; unrealistically touting AI's ability to identify and address hate speech, excessive violence and underage users; implementing an algorithm designed to heighten "meaningful social interaction" in a manner that stoked division and discord; allowing known drug cartels, human traffickers and armed groups to utilize Facebook's platforms to encourage their violent and illegal activities; discussing monetizing tweens through engaging them during play dates because they were a "valuable but untapped audience;" and covering up the

_____

[8] Newton and Swisher, *Is the Problem Facebook? Or the Internet?,* THE NEW YORK TIMES, Nov. 4, 2021.

extent to which Facebook's accounts were opened by existing users and the resultant inability of Facebook to present a realistic count of unique platform users.

33.     Facebook was trading at approximately $376 per share in September 2021 prior to the publication of the above information.  By October 27, 2021, Facebook  traded at $312, representing a drop of at least $64 a share, equating to a total drop in excess of hundreds of billions of dollars.

34.     In its 2020 Annual Report filed with the SEC on January 28, 2021, Facebook stated that it has 3.3 billion users, as reflected in the following chart:



35.     Facebook's users are critical to the Company's business because the Company's steady increase in users allows the Company to generate and charge more for advertising.

36.     Facebook derives substantially all its revenue from advertising aimed at its users.  As indicated above, approximately 3.3 billion people used the Company's social media website, www.facebook.com, on a monthly basis in the fourth quarter of 2020. Facebook connects its customers – sellers and advertisers of goods and services – with its users, generating revenue primarily through the sale of advertisements that are targeted to Facebook users based on their demographics and various other information.

37.     As stated on Facebook's website: "With our powerful audience selection tools, you can target people who are right for your business.  Using what you know about your customers-like demographics, interests and behaviors-you can connect with people similar to them."

38.     Facebook also provides detailed analytical data to advertisers on how their ad campaigns are performing, including among certain groups of Facebook users with specified attributes and characteristics that the advertiser seeks to target.  By monitoring this data and providing this information to its customers on an ongoing basis, Facebook captures consumer behavior, profile, preferences, lifestyle, and other attributes which allow Facebook to run targeted ads.  This enables advertisers to specify the groups of users that will be targeted to receive the advertisements.

39.     Given the importance of user growth to the success of the Company's targeted advertisements, Facebook's financial performance depends on its success in

attracting active users to its platform.  As Defendants acknowledged as far back as Facebook's 2017 Annual Report on Form 10-K, "*[t]he size of our user base and our users' level of engagement are critical to our success.  Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products*, particularly for Facebook and Instagram."

40.    Thus, any information demonstrating problems with increasing the number of users, user discontent, the aging or lack of engagement in its users, errors in calculating users or failing to eliminate duplicate accounts was critical to Facebook's financial results and success.

41.    Facebook's other annual and quarterly reports issued prior to the start of the Class Period also stressed the importance of these facts.  On November 3, 2016, Facebook filed with the SEC a Form 10-Q quarterly report for the quarter ended September 30, 2016 ("Q3 2016 10-Q"). The Q3 2016 10-Q was signed by Defendant Wehner. Attached to the Q3 2016 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

42.    The Q3 2016 10-Q stated that:

*The size of our user base and our users' level of engagement are critical to our success*. *Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users*. We anticipate that our active user growth rate will continue to decline over time as the size of our active user base increases, and as we achieve higher market penetration rates. *If people do not perceive our products to be useful, reliable, and trustworthy, we may not be able to*

*attract or retain users or otherwise maintain or increase the frequency and duration of their engagement*.

43.     The Q3 2016 10-Q stated that, between September 30, 2013 and September 30, 2016, Facebook's monthly active users ("MAUs") grew from 199 million to 229 million in the United States and Canada. The Q3 2016 10-Q also stated that, during the same time frame, Facebook's MAUs in Europe grew from 276 million to 342 million.

44.     The Q3 2016 10-Q stated, in relevant part, the following about individuals with multiple accounts:

> In 2015, for example, we estimate user-misclassified and undesirable accounts may have represented less than 2% of our worldwide MAUs. We believe **the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom** and higher in developing markets such as India and Turkey.

(Emphasis added.)

45.     On February 3, 2017, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2016 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

46.     The 2016 Annual Report stated:

> *The size of our user base and our users' level of engagement are critical to our success. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products*, particularly for Facebook and Instagram. . . *If people do not perceive our products to be useful, reliable, and trustworthy,*

*we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement*.

47.    The 2016 10-K stated that, between December 31, 2013 and December 31, 2016, MAUs in the United States and Canada grew from 201 million to 231 million. The 2016 10-K also stated that, in Europe during the same time frame, Facebook's MAUs grew from 282 million to 349 million.

48.    The 2016 10-K represented, in pertinent part, the following about the number of duplicate and fake accounts at Facebook:

> In 2016, we estimate that "duplicate" accounts (an account that a user maintains in addition to his or her principal account) may have represented approximately 6% of our worldwide MAUs. We also seek to identify "false" accounts . . . In 2016, for example, we estimate user-misclassified and undesirable accounts may have represented approximately 1% of our worldwide MAUs. We believe *the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom* and higher in developing markets such as India and Turkey.

> (Emphasis added.)

49.    On February 1, 2018, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2017 ("2017 10-K"). The 2017 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2017 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

50.    The 2017 Annual Report stated:

*The size of our user base and our users' level of engagement are critical to our success. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products*, particularly for Facebook and Instagram. We anticipate that our active user growth rate will continue to decline over time as the size of our active user base increases, and it is possible that the size of our active user base may fluctuate or decline in one or more markets, particularly in markets where we have achieved higher penetration rates. For example, in the fourth quarter of 2017, we experienced a slight decline on a quarter-over-quarter basis in the number of daily active users on Facebook in the United States & Canada region. *If people do not perceive our products*

*to be useful, reliable, and trustworthy, we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement*.

51.    The 2017 10-K represented that, between December 31, 2016 and December 31, 2017, MAUs in the United States and Canada grew from 231 million to 239 million. The 2017 10-K also represented that, during the same time frame, Facebook's MAUs in Europe grew from 349 million to 370 million.

52.    The 2017 10-K stated, in pertinent part, the following about individuals with multiple accounts:

> We believe the *percentage of duplicate accounts is meaningfully higher in developing markets* such as India, Indonesia, and the Philippines, *as compared to more developed markets.*

(Emphasis added.)

53.    Prior to the start of the Class Period, Facebook had denied concerns that it may not have been complying with its stated policies.  On July 16, 2018, Facebook published on its website a statement titled, "Working to Keep Facebook Safe." In pertinent part, the statement said:

CLASS ACTION COMPLAINT - 16

*It has been suggested that turning a blind eye to bad content is in our commercial interests. This is not true.* Creating a safe environment where people from all over the world can share and connect is core to Facebook's long-term success.

\*       \*       \*

**How We Create and Enforce Our Policies**

More than 1.4 billion people use Facebook every day from all around the world. They post in dozens of different languages: everything from photos and status updates to live videos. Deciding what stays up and what comes down involves hard judgment calls on complex issues — from bullying and hate speech to terrorism and war crimes. *It's why we developed our Community Standards with input from outside experts* — including academics, NGOs and lawyers from around the world. We hosted three Facebook Forums in Europe in May, where we were able to hear from human rights and free speech advocates, as well as counter- terrorism and child safety experts.

These Community Standards have been publicly available for many years, and this year, for the first time, *we published the more detailed internal guidelines used by our review teams to enforce them.*

\*       \*       \*

Reviewing reports quickly and accurately is essential to keeping people safe on Facebook. This is why we're doubling the number of people working on our safety and security teams this year to 20,000. This includes over 7,500 content reviewers. *We're also investing heavily in new technology to help deal with problematic content on Facebook more effectively. For example, we now use technology to assist in sending reports to reviewers with the right expertise, to cut out duplicate reports, and to help detect and remove terrorist propaganda and child sexual abuse images before they've even been reported.*

(Emphasis added.)

54.     On July 17, 2018, Facebook updated its "Working to Keep Facebook Safe" statement. The updated statement said, in relevant part:

**Cross Check**

*We want to make clear that we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group — whether on the right or the left. 'Cross Check' — the system described in Dispatches — simply means that some content from certain Pages or Profiles is given a second layer of review to make sure we've applied our policies correctly.*

*This typically applies to high profile, regularly visited Pages or pieces of content on Facebook so that they are not mistakenly removed or left up.* Many media organizations' Pages — from Channel 4 to The BBC and The Verge — are cross checked. We may also Cross Check reports on content posted by celebrities, governments, or Pages where we have made mistakes in the past. For example, we have Cross Checked an American civil rights activist's account to avoid mistakenly deleting instances of him raising awareness of hate speech he was encountering.

*To be clear, Cross Checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct*.

*        *        *

**Minors**
*We do not allow people under 13 to have a Facebook account.* If someone is is[sic] reported to us as being under 13, the reviewer will look at the content on their profile (text and photos) to try to ascertain their age. If they believe the person is under 13, the account will be put on a hold and the person will not be able to use Facebook until they provide proof of their age. Since the program, we have been working to update the guidance for reviewers to put a hold on any account they encounter if they have a strong indication it is underage, even if the report was for something else.

(Emphasis added.)

55.    On January 31, 2019, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2018 ("2018 10-K"). The 2018 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2018 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

56.    The 2018 10-K stated that, between December 31, 2017 and December 31, 2018, MAUs grew from 239 million to 242 million in the United States and Canada. The 2018 10-K also stated that, during the same time frame, Facebook's MAUs grew from 370 million to 381 million in Europe.

57.    The 2018 10-K stated, in pertinent part, the following about multiple accounts:

> We believe **the percentage of duplicate accounts is meaningfully higher in developing markets** such as the Philippines and Vietnam, **as compared to more developed markets.**

(Emphasis added.)

58.    On January 29, 2020, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2019 ("2019 10-K"). The 2019 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2019 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal

control over financial reporting, and the disclosure of all fraud.

59.     The 2019 10-K represented that, between December 31, 2018 and December 31, 2019, MAUs grew from 242 million to 248 million in the United States and Canada. The 2019 10-K also represented that, during the same time frame, Facebook's MAUs grew from 381 million to 394 million in Europe.

60.     The 2019 10-K stated, in relevant part, the following about multiple accounts:

> We believe **the percentage of duplicate accounts is meaningfully higher in developing markets** such as the Philippines and Vietnam, **as compared to more developed markets.**

(Emphasis added.)

61.     On January 28, 2021, Facebook filed with the SEC a Form 10-K annual report for the fiscal year ended December 31, 2020 ("2020 10-K"). The 2020 10-K was signed by Defendants Zuckerberg and Wehner. Attached to the 2020 10-K were SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

62.     The 2020 10-K stated that, between December 31, 2019 and December 31, 2020, MAUs in the United States and Canada grew from 248 million to 258 million. The 2020 10-K also represented that, during the same time frame, Facebook's MAUs in Europe grew from 394 million to 419 million.

63.     The 2019 10-K stated, in pertinent part, the following about multiple

CLASS ACTION COMPLAINT - 20

accounts:

> We regularly evaluate our Facebook metrics to estimate the number of "duplicate" and "false" accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account.
>
> In the fourth quarter of 2020, we estimated that duplicate accounts may have represented approximately 11% of our worldwide MAUs.  We believe **the percentage of duplicate accounts is meaningfully higher in developing markets** such as the Philippines and Vietnam, **as compared to more developed markets.**
>
> (Emphasis added.)

## FALSE STATEMENTS DURING THE CLASS PERIOD

64.    On April 29, 2021, the first trading day after Facebook held its first quarter 2021 earnings call, Defendant Zuckerberg stated that "[f]or the last several years, we focused a lot on content moderation and privacy work, and I view customer support as the next pillar of the trust and safety work for our services." During the call, an analyst questioned Facebook's executives about the Company's algorithmic amplification, which could lead to more controversial content being pushed to users' News Feeds. In response, Defendant Zuckerberg downplayed those concerns, stating that Facebook had practices in place that are "quite robust" and assured investors that "we don't want extremist content or any of that stuff on our services, so if anything to the contrary of trying to promote that, we go out of our way to try to reduce that."  Defendant Wehner further assured investors that "more than anyone else in the industry we invest on the safety and security side to sort of keep bad content off the site before it gets ranked and put into what people see." Defendant Wehner also stated that Facebook has "the most robust set of content

policies out there" and "we really do more than anyone else in the industry on the safety and security front to prevent things like misinformation and bad content going into the system in the first place."

65.     On April 29, 2021, Facebook filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2021. The Form 10-Q was signed by Defendant Wehner and contained certifications by Defendants Zuckerberg and Wehner that attested to the purported accuracy and completeness of the Form 10-Q. In the 10-Q, Facebook represented that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets." In addition, Facebook touted its continued investment in certain "company priorities," including, among other things, "continue making progress on the major social issues facing the internet and our company, including privacy, safety, and security" and "communicate more transparently about what we're doing and the role our services play in the world."

66.     On May 26, 2021, Facebook held its annual meeting of shareholders. During the meeting, in response to a shareholder's question about the Company's policies on censorship, Defendant Clegg stated that "[w]e always strive to enforce our policies evenly without regard to the political affiliation of those affected," and while Facebook supports free expression, "of course, that doesn't mean that politicians can just say things that clearly cause harm and our policies on hate speech, incitement and so on apply to everyone regardless of their position of power." Defendant Clegg further emphasized that "[s]o . . . we're very clear, we remove content that poses specific harm to people, content

intended to intimidate, exclude or silence views."

67.     Similarly, in response to another shareholder's question about Facebook's plan to manage the proliferation of "fake news" on its platform, Defendant Clegg stated that "remember, we really are committed to fighting wherever we can the spread of false information on Facebook" and "[w]e remove content that violates our Community Standards . . . and we reduce distribution of stories, which are marked as false. And we . . . try to inform people, so that they can decide for themselves what to read, trust, and share." During the meeting, Defendant Zuckerberg assured investors that "for the last several years, our team that has been focused on [a] kind of trust and safety overall, has been more focused on content moderation, so making sure that we can identify harmful content and take it down."

68.     On July 29, 2021, Facebook filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2021. The Form 10-Q was signed by Defendant Wehner and contained certifications by Defendants Zuckerberg and Wehner that attested to the purported accuracy and completeness of the Form 10-Q. In the 10-Q, Facebook represented that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets." In addition, Facebook touted its continued investment in certain "company priorities," including, among other things, "continue making progress on the major social issues facing the internet and our company, including privacy, safety, and security" and "communicate more transparently about what we're doing and the role our services play in the world."

69.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Facebook misrepresented its user growth; (2) Facebook was losing the attention of its most important demographic — teenagers and young people — with no clear path to gaining it back; (3) Facebook knew, or should have known, that duplicate accounts represented a greater portion of its growth than stated, and it should have provided more detailed disclosures as to the implication of duplicate accounts to Facebook's user base and growth; (4) young adults engage with Facebook far less than their older cohorts and do not perceive Facebook's products to be useful, reliable, and trustworthy; (5) Facebook's user base has been aging faster, on average, than the general population; (6) Facebook did not provide a fair platform for speech, and regularly protected high profile users via its Cross Check/XCheck system; (7) despite being aware of their use of Facebook's platforms, the Company failed to respond meaningfully to drug cartels, human traffickers, and violent organizations; (8) Facebook has been working to attract preteens to its platform and services; and (9) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

70.     The truth about Facebook's fraud slowly began to emerge through a series of partial disclosures.  On September 13, 2021, during trading hours, *The Wall Street*

*Journal* ("WSJ") published an article titled "Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt." It would be the first of nine articles published by the WSJ based on documents provided by a whistleblower. The article stated, in relevant part:

> ***Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame***.
>
> ***In private, the company has built a system that has exempted high-profile users from some or all of its rules***, according to company documents reviewed by The Wall Street Journal.
>
> The program, known as "cross check" or "XCheck," was initially intended as a quality-control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists. ***Today, it shields millions of VIP users from the company's normal enforcement process***, the documents show. ***Some users are "whitelisted"—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come.***
>
> \*       \*       \*
>
> A 2019 internal review of Facebook's whitelisting practices, marked attorney- client privileged, found ***favoritism to those users to be both widespread and "not publicly defensible." "We are not actually doing what we say we do publicly,"*** said the confidential review. It called the company's actions "a breach of trust" and added: ***"Unlike the rest of our community, these people can violate our standards without any consequences."***
>
> \*       \*       \*

> **For ordinary users, Facebook dispenses a kind of rough justice in assessing whether posts meet the company's rules** against bullying, sexual content, hate speech and incitement to violence. Sometimes the company's automated systems summarily delete or bury content suspected of rule violations without a human review. At other times, material flagged by those systems or by users is assessed by content moderators employed by outside companies.
>
> *     *     *
>
> **Users designated for XCheck review, however, are treated more deferentially.** Facebook designed the system to minimize what its employees have described in the documents as "PR fires"—negative media attention that comes from botched enforcement actions taken against VIPs.
>
> If Facebook's systems conclude that one of those accounts might have broken its rules, they don't remove the content—at least not right away, the documents indicate. They route the complaint into a separate system, staffed by better-trained, full-time employees, for additional layers of review.
>
> (Emphasis added.)

71.    On this news, Facebook shares dropped by $5.17 to close at $376.51 on September 13, 2021.

72.    On September 28, 2021, during market hours, the WSJ published an article titled, "Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show." The article said, in pertinent part:

> **Internal Facebook documents reviewed by The Wall Street Journal show the company formed a team to study preteens, set a three-year goal to create more products for them and commissioned strategy papers about the long-term business opportunities presented by these potential users.** In one presentation, it contemplated whether there might be a way to engage children during play dates.

*"Why do we care about tweens?" said one document from 2020. "They are a valuable but untapped audience*."

\*      \*      \*

On Monday, *Adam Mosseri, head of Instagram, said the company would pause the development of a version of the app for children, often referred to as Instagram Kids.* He said the company wanted time to talk to parents, experts and lawmakers before proceeding. He also contended that underage users would simply lie about their age to access Instagram if a version for children under the age of 13 wasn't available.

\*      \*      \*

*Over the past five years, Facebook has made what it called "big bets" on designing products that would appeal to preteens across its services, according to a document from earlier this year.*

*In more than a dozen studies over that period, the documents show, Facebook has tried to understand which products might resonate with children and "tweens" (ages 10 through 12*), how these young people view competitors' apps and what concerns their parents.

"With the ubiquity of tablets and phones, kids are getting on the internet as young as six years old. We can't ignore this and we have a responsibility to figure it out," said a 2018 document labeled confidential. "Imagine a Facebook experience designed for youth."

*Earlier this year, a senior researcher at Facebook presented to colleagues a new approach to how the company should think about designing products for children. It provided a blueprint for how to introduce the company's products to younger children.* Rather than offer just two types of products—those for users 13 and older, and a messenger app for kids—Facebook should tailor its features to six age brackets, said a slide titled "where we've been, and where we're going."

*     *     *

> In a study about household dynamics, a Facebook user-experience researcher found that although teens often inspired their younger relatives to join Instagram, those same teens also often counseled the tweens not to share too frequently, and not to post things they would later regret.

> "I don't know how to get a perfect picture like my sister says you need to post," a tween told the researcher.

> ***"We need to understand if this influence over preteen sharing holds at scale," the researcher wrote in a document posted to Facebook's internal message board early this year. "If it is common that teens are discouraging preteens from sharing, there are obvious implications for creation and the ecosystem both in the near and longer-term as preteens are the next generation coming onto the platform*.**" The presentation cited concern among teenagers about oversharing as a "myth" about Instagram.

> (Emphasis added.)

73.    On this news, Facebook share prices dropped $7.32 to close at $340.65 on September 28, 2021.

74.    On October 3, 2021, CBS News aired a television segment on *60 Minutes* interviewing the Whistleblower, revealed to be Frances Haugen, on her findings during her time at Facebook. On that same day, CBS published an article containing highlights from the interview, stating in relevant part:

> "The thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook," Haugen said. "***And Facebook, over and over again, chose to optimize for its own interests, like making more money.***"

*     *     *

Haugen told 60 Minutes that weeks after the 2020 election, Facebook dissolved a department called "Civic Integrity" which worked on risks to elections including misinformation.

"Like, they basically said, 'Oh good, we made it through the election. There wasn't riots. We can get rid of Civic Integrity now,'" Haugen said. "Fast forward a couple months, we got the insurrection. And when they got rid of Civic Integrity, it was the moment where I was like, *I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous.*'"

\*     \*     \*

Haugen said Facebook's algorithm optimizes for content that generates engagement. That's led to publishers, "realizing that if they produce more content that is angry and divisive and polarizing, they'll get more views," in her words.

*"Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money,"* Haugen added.

(Emphasis added.)

75.    On October 4, 2021, CBS News published an article titled, "Whistleblower's SEC Complaint: Facebook Knew Platform Was Used to 'Promote Human Trafficking and Domestic Servitude,'" containing the whistleblower complaints against Facebook filed with the SEC. There were eight complaints shared in the CBS article. The whistleblower complaints against Facebook, which the CBS News article discussed, contained the following allegations:

a.  Facebook knew its platforms perpetuated misinformation, but did little to stop it.  In relevant part, this complaint alleged:

Facebook misled investors and the public about its role perpetuating misinformation and violent extremism relating to the 2020 election and January 6th insurrection.

\*       \*       \*

Facebook made misstatements and omissions regarding its facilitation of political misinformation, including in testimony before Congress.

\*       \*       \*

**Facebook only actions less than 1% of Violence and Inciting to Violence (V&I) content on Facebook** – Facebook's strategy of focusing on Content over other solutions lets this content effectively run free[.]

\*       \*       \*

**Facebook has demonstrated via experiments using brand new test accounts how rapidly Facebook's algorithms can veer people interested in Conservative topics into radical or polarizing ideas and groups/pages**, some demonstrating traits of Coordinated Inauthentic Behavior (CIB) akin to what was seen by the Macedonians in 2016[.]

\*       \*       \*

**Pages that repeat offend for misinformation are permitted to continue to spread misinformation**[.]

\*       \*       \*

Facebook has **"whitelisted" political users who violate its terms, leading to the spread of misinformation and violence** on and off the platform.

(Emphasis added.)

b.  Facebook did little to combat human traffickers using its platform. In pertinent part, this complaint said:

Facebook misled investors and the public about its promotion
of human trafficking / slaver / servitude.

\*     \*     \*

***Internal company documents show that Facebook and
Instagram were, and are, being used to promote human
trafficking and domestic servitude.*** An internal Facebook
record created no later than April 2019 states: ***"We have
observed increasing number of reported content that
indicates that the platform is being used to coordinate and
promote domestic servitude*** . . . real world harm caused by
domestic servitude as well as risk to the business due to
potential PR fires . . ."

\*     \*     \*

Notably, there was widespread media coverage of an
"undercover investigation by BBC News Arabic" in or around
October 2019, which found that ***"domestic workers are being
illegally bought and sold online in a booming black market . . .
on Facebook-owned Instagram, where posts have been
promoted via algorithm- boosted hashtags, and sales
negotiated via private messages."***

\*     \*     \*

***However, even after this news coverage, Facebook's regular
SEC filings continually omitted specific references to
trafficking, domestic servitude, human slavery, and the Apple
App Store escalation.***

In fact, Facebook's failure to solve human trafficking and
servitude on its platforms threatened its distribution on the
Apple App Store. Moreover, as the enclosed Facebook records
show, Facebook's statements about human trafficking
were false. For example, ***Facebook has confirmed:*** [. . .] ***[W]e
received communication from Apple where the company
threatened to pull FB & IG from its App Store due to them
identifying content promoting 'domestic servitude'*** . . . [. . .]
However, due to the underreporting of this behaviour and
absence of proactive detection, ***newly created and existing***

***content not captured in the IG sweep meant that domestic servitude content remained on the platform.*** [. . .] ***Was this issue known to Facebook before BBC enquiry and Apple escalation? Yes.*** [. . .] ***[O]ur platform enables all three stages of the human exploitation lifecycle (recruitment, facilitation, exploitation)***[.]"

(Emphasis added.)

   c.  Confirming the earlier WSJ article, Facebook's XCheck program gave preferential treatment to certain users. In relevant part, this complaint said:

> Facebook misled investors and the public about equal enforcement of its terms given that high-profile users are "whitelisted" under its "XCheck" program.

*    *    *

> ***[O]ver the years, many XChecked people & entities have been exempted from enforcement. That means, for a select few members of our community, we are not enforcing our policies and standards.*** Unlike the rest of our community, these people can violate our standards without any consequences[.]

*    *    *

> We are exempting certain people and businesses from our policies and standards [...] ***This undermines our fairness and legitimacy efforts; creates legal and compliance risks for the company . . . Based on an initial company-wide audit, this problem is pervasive across the country***[.]

(Emphasis added.)

   d.  Facebook misled investors and the public the extent to which Facebook was used to foment ethnic violence and global division. In relevant part, this complaint revealed:

Facebook misled investors and the public about bringing "the world closer together" where it relegates international users and promotes global division and ethnic violence.

\*       \*       \*

[. . .] *Facebook's shareholders proposed having a human/civil rights expert on the board, stating:*

"In September 2020, *a Facebook employee reported Facebook ignored global political manipulation from foreign governments seeking to 'abuse our platform on vast scales to mislead their own citizenry.'* [. . .]

Children's rights organization Plan International found *online attacks against girls globally are most prevalent on Facebook.*

\*       \*       \*

*In Myanmar, where violence against the Rohingya 'bears the hallmarks of genocide,' a Facebook commissioned human rights report showed the company 'created an enabling environment.' In Ethiopia, Facebook's platform amplified ethnic tensions and calls for genocide, inciting violence.*

*In rejecting that shareholder proposal, Facebook represented:*

"We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts and fight abuse across our services. *We believe that implementing this proposal is unnecessary because of our continued progress in this area and our efforts to fight abuse across our services.* . ."

\*       \*       \*

*FIRST, Facebook Lacks Adequate Resources for International Issues.*

*       *       *

Global Remit [n.b. budget] "US – 87%, ROW [Rest of World] (India, France, Italy) – 13%.

*       *       *

**SECOND, Documents Show that Facebook's Language Capabilities are Inadequate, Leading to Global Misinformation and Ethnic Violence.**

[. . .] Facebook documentation outlines:

[. . .] [I]n the Afghanistan market, the action rate for Hate Speech is worryingly low at 0.23 per cent[.]

*       *       *

In particular, Facebook's written translations (in limited languages) do not account for regions where significant users cannot read.

*       *       *

Nor do they appropriately manage different dialects:

"Arabic is not one language, truly, rather it is better to consider it a family of languages – many of which are mutually incomprehensible . . . [in other dialects] *they will still misunderstand cultural or contextual content, which is key to problem areas such as Hate Speech and even Terrorism.* [. . .] [A]s every Arabic nation save Western Sahara is on the At-Risk Countries list and *deals with such severe issues as terrorism and sex trafficking--it is surely of the highest importance to put more resources to the task of improving Arabic systems.*"

*       *       *

**THIRD, Documents Confirm That Facebook's Actions and Choices Facilitated Harmful Content and Misinformation Around the World.**

1

2                                  *      *      *

3          **"40% of Sampled Top VPV [View Port Views] Civic Posters**
4          **in West Bengal Were Fake/Inauthentic.** [. . .] The message
           comes to dominate the ecosystem with over 35% of members
5          having been recommended a cell group by our algorithms."

6                                  *      *      *

7
           **"Hate Speech Classifier[s] for Myanmar/Burmese . . . hate**
8          **speech text classifier. . . currently being used in production /**
9          **being maintained? . . . it doesn't look like it's currently in**
           **use?"**
10

11         (Emphasis added.)

12      e.  Facebook was inflating its advertising reach and user base in key demographics.

13
           This complaint alleged, in pertinent part:
14
           For years, Facebook has misled investors and advertisers about
15         shrinking user base in important demographics, declining
16         content production, and the true number of recipients of
           "Reach & Frequency" advertising[.]
17

18                                 *      *      *

19
           **[. . .] Facebook has failed to disclose internal data showing a**
20         **contraction of the user base in important demographics,**
           **including American teenagers and young adults. The**
21         **company has also hidden the extent to which content**
22         **production per user has been in long-term decline.**

23                                 *      *      *

24
           Internal documents show that youth and teens, a crucial
25         demographic for advertisers, are deliberately targeted for
26         Instagram in order to bring their family members onto
           Facebook platforms:
27

28

CLASS ACTION COMPLAINT - 35

"Teens shape the household's perception of Instagram. [. . .] Family-first acquisition strategies are proven effective (e.g. TikTok) and warrant exploration on IG [Instagram]."

\*      \*      \*

**Facebook is inflating it's [sic] growth numbers by not disclosing that a higher fraction of teen accounts are "Same User with Multiple Accounts" (SUMAs), or duplicate accounts.** In terms of teen users, records indicate:

**"Over 15% of new teen accounts are existing users creating a SUMA child [secondary] account."**

**Internal records confirm how teens and young adults in more developed economies are using the platform less.**

"Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. [. . .]"

**"The United States is among the first countries where we observed teen MAP [Monthly Active People] decline, starting in 2012** . . . teens have been taking longer to adopt Facebook . . . One immediately concerning takeaway . . . is a flattening growth trends for cohorts below 18 years[.]"

\*      \*      \*

**Although Facebook has sophisticated algorithms to assess the existence of SUMAs / duplicate accounts, Facebook is well aware that its failure to include SUMA duplicate accounts distorts its Reach & Frequency (R&F) advertising models**:

"Previous analysis have [sic] shown that including SUMA modeling into audience sizes would **reduce overestimation of population in age groups for our top 30 ad markets by 50% when included by itself and by 63% when included in conjunction with age modeling.**"

By delivering too many ads to users that the advertisers did not want to pay for, **Facebook overcharged advertisers on a vast scale**:

"But wont' [sic] this cause the R&F [reach and frequency] to violate their contract?  ***If the ads is [sic] targeted to 1M accounts with a guarantee of 90%, and we deliver to 900k accounts but only 800k users [due to SUMA], wont' [sic] this make R&F [reach and frequency] pay penalty if we report 800k as coverage?***["]

(Emphasis added.)

76.    As a result of the October 3 and 4 revelations, Facebook's share price dropped $16.78 per share, or approximately 4.9%, from closing at $343.01 on October 1, 2021, the prior trading day, to close at $326.23 on October 4, 2021.  By October 27, 2021, Facebook's stock had fallen to $312 per share.

77.    In a November 2, 2021 statement by Facebook's VP of Artificial Intelligence, Jerome Pesenti, Facebook indicated that it was shutting down the Face Recognition System ("FRS") that had collected up to that point more than a billion individual facial recognition templates.   The implementation of the FRS has been described as a "growth hack," used by Facebook to encourage facially identified users to intensify their use of Facebook.  Since its implementation, FRS has been used in negative ways, such as by Clearview AI to scrape user faces and sell the information to repressive regimes to identify dissenters.  New York Times tech reporter Casey Newton indicated that FRS's value as a growth hack to Facebook most likely had been exhausted by the time of Pesenti's statement.[9]  Once again, using FRS to encourage those identified to

_____

[9] Newton and Swisher, *Is the Problem Facebook? Or the Internet?,* THE NEW YORK TIMES, Nov. 4, 2021.

expand their engagement with Facebook platforms is the antithesis of "organic."

78.      From the first WSJ article published on September 13, 2021, to October 27, 2021, Facebook share prices fell by $64, materially damaging investors.

79.      Even after these disclosures, major news organizations continued to run stories providing additional details on the damaging internal Facebook information disclosed by the whistleblower.  For example, on October 25, 2021, AP News ran an article entitled "People or Profit?  Facebook Papers Show Deep Conflict Within" which stated:

> ***Young adults engage with Facebook far less than their older cohorts***, seeing it as an "outdated network" with "irrelevant content" that provides limited value for them, ***according to a November 2020 internal document***. It is "boring, misleading and negative," they say.

> In other words, the young see Facebook as a place for old people.

> ***Facebook's user base has been aging faster, on average, than the general population, the company's researchers found. Unless Facebook can find a way to turn this around, its population will continue to get older and young people will find even fewer reasons to sign on, threatening the monthly user figures that are essential to selling ads***.

80.      The October 25, 2021 AP News article also stated:  "***Final responsibility for this state of affairs rests with CEO Mark Zuckerberg, who holds what one former employee described as dictatorial power over a corporation that collects data on and provides free services to roughly 3 billion people around the world***."

CLASS ACTION COMPLAINT - 38

81.    On October 7, 2021, Time Magazine ran an article entitled "Facebook Will Not Fix Itself."  The article argued that greater regulation of Facebook is needed and stated that "The sad truth is that the unregulated tech industry produces products that are unsafe" and "Facebook's business model [is] not an accident, but rather the inevitable result of a dangerous design. In many cases, the documents show, Facebook chose to double-down despite awareness of the harm it was causing and the pressure for change."  The article also noted that "Senators from both parties at this week's hearing expressed support for Ms. Haugen's testimony and for legislation to address it" and included the following image:

[The remainder of this page is intentionally left blank.]

82.     On October 25, 2021, CNN ran an article entitled "The Facebook Papers May be the Biggest Crisis in the Company's History."  The article stated that "Facebook has confronted whistleblowers, PR firestorms and Congressional inquiries in recent years. But now it faces a combination of all three at once in what could be the most intense and wide-ranging crisis in the company's 17-year history."  The article noted that "on Friday, another former Facebook employee anonymously filed a complaint against the company to the SEC, with allegations similar to Haugen's.  Facebook has dealt with scandals over its approach to data privacy, content moderation and competitors before. But the vast trove of documents, and the many stories surely still to come from it, touch on concerns and problems across seemingly every part of its business: its approach to combatting hate speech and misinformation, managing international growth, protecting younger users on its platform and even its ability to accurately measure the size of its massive audience."

83.     On November 19, 2021, the Wall Street Journal ran an article entitled "States Investigate Instagram Over How it Affects Children."  The article noted that "A bipartisan coalition of state attorneys general said Thursday it is investigating how Instagram attracts and affects young people, amping up the pressure on parent company Meta Platforms Inc. over potential harms to its users.  Led by eight states, including Massachusetts and Nebraska, the coalition is focused on 'the techniques utilized by Meta to increase the frequency and duration of engagement by young users and the resulting harms caused by such extended engagement.'"

84.     The article included a quote from Nebraska Attorney General Doug Peterson, a Republican, who said: "When social media platforms treat our children as

mere commodities to manipulate for longer screen time engagement and data extraction, it becomes imperative for state attorneys general to engage our investigative authority under our consumer protection laws."  The November 19, 2021 Wall Street Journal article was a follow-up to an earlier article the paper had run in September 2021.  In an interview at the time of the Journal's September 2021 article, Instagram head Adam Mosseri acknowledged the findings and said that the company had found remediating the problem extremely difficult. Mr. Mosseri's comments helped convince the attorneys general that the company was unlikely to address their concerns absent a challenge, according to a person familiar with the probe.  "Facebook, now Meta, has failed to protect young people on its platforms and instead chose to ignore or, in some cases, double down on known manipulations that pose a real threat to physical and mental health—exploiting children in the interest of profit," said Ms. Healey, a Democrat. She cited Instagram's user survey and focus group work finding some teenagers associated usage of the app with mental health harms and even thoughts of self-harm.

85.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded securities of Facebook during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class

are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)  whether Defendants' acts as alleged violated the federal securities laws;

b)  whether Defendants' statements to the investing public during the Class

Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c)  whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)  whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e)  whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f)  whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

91.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

92.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud- on-the-market doctrine in that:

CLASS ACTION COMPLAINT - 44

a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)  the omissions and misrepresentations were material;

c)  the Company's securities are traded in efficient markets;

d)  the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e)  the Company traded on the NASDAQ, and was covered by multiple analysts;

f)  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g)  Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h)  unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

93.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

94.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such

information, as detailed above.

## **<u>COUNT I</u>**
### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
### **Against All Defendants**

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

97.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

99.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

100.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

101.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price

of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

102.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

103.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

104.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

### COUNT II
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

105.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and

indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

107.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

108.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

109.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the

general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

110.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

1   Dated:  November 22, 2021                  Respectfully submitted,

2                                 BOTTINI & BOTTINI, INC.

3                                 Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)

4

5                                 *s/ Francis A. Bottini, Jr.*
                                   Francis A. Bottini, Jr.

6                                 7817 Ivanhoe Avenue, Suite 102

7                                 La Jolla, California 92037
Telephone:    (858) 914-2001

8                                 Facsimile:    (858) 914-2002
fbottini@bottinilaw.com

9                                 achang@bottinilaw.com

10                                *Attorneys for Plaintiff Juan Perez and*
*the Proposed Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT - 51

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Juan Perez ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: see Exhibit A

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

11/21/2021 | 2:12 PM PST
Executed this _____ day of _____, 2021.

_____  *Mr. Juan Perez*  _____
                                    Juan Perez

RE: FACEBOOK SHAREHOLDER CASE

# EXHIBIT A

| Date | Bought | Price | Cost | Date | Sold | Price | Proceeds |
|------------|-------:|---------|----------|------:|------:|------:|---------:|
| 10/12/2021 | 10 | $373.75 | $3737.50 | n/a | n/a | n/a | n/a |

Shares held at end of Class Period:  10